UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM PERDUE,

    Plaintiff,                                           Hon. Ellen S. Carmody

v.                                                    Case No. 1:04 CV 517

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.
_____/

## **OPINION**

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits under Title II of the Social Security Act. On October 22, 2004, the parties consented to proceed in this Court for all further proceedings, including an order of final judgment. 28 U.S.C. § 636(c)(1). By Order of Reference, the Honorable Wendell A. Miles referred the matter to this Court. (Dkt. #14).

Section 405(g) limits the Court to a review of the administrative record and provides that if the Commissioner's decision is supported by substantial evidence it shall be conclusive. The Commissioner has found that Plaintiff is not disabled within the meaning of the Act. For the reasons stated below, the Court concludes that the Commissioner's decision is not supported by substantial evidence. Accordingly, the Commissioner's decision is **reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

## **STANDARD OF REVIEW**

The Court's jurisdiction is limited to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision, and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and the Commissioner's findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). The standard

affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 37 years of age on the date of the ALJ's decision. (Tr. 13). He possesses a ninth grade education and worked previously as a laborer, hi-lo operator, and inspector. (Tr. 13, 95, 102-05).

Plaintiff applied for benefits on June 11, 2002, alleging that he had been disabled since May 12, 2002, because he "cannot stand or walk any length of time." (Tr. 60-62, 89). Plaintiff's application was denied, after which time he requested a hearing before an ALJ. (Tr. 27-59). On December 19, 2003, Plaintiff appeared before ALJ Douglas Johnson, with testimony being offered by Plaintiff and vocational expert, Paul Delmar. (Tr. 224-53). In a written decision dated March 23, 2004, the ALJ determined that Plaintiff was not disabled as defined by the Act. (Tr. 12-20). The Appeals Council declined to review the ALJ's decision, rendering it the Commissioner's final decision in the matter. (Tr. 3-5). Plaintiff then initiated this appeal pursuant to 42 U.S.C. § 405(g).

## MEDICAL HISTORY

On February 8, 2000, Plaintiff was examined by Dr. Timothy Hulst. (Tr. 170-71). Plaintiff reported that he was experiencing pain in his left foot and ankle. (Tr. 171). An examination of Plaintiff's feet revealed that "both arches are flat." Plaintiff exhibited "normal" inversion and

eversion of his right foot, but "limited" inversion and eversion of the left foot. Plaintiff exhibited "normal" dorsiflexion and plantar flexion of both feet. Plaintiff favored his left foot when walking and exhibited excessive pronation. *Id.* The doctor concluded that Plaintiff was suffering from pes plano valgus [1] (in both feet) as well as possible arthritic changes in his left foot and ankle. (Tr. 170).

On March 17, 2000, Plaintiff participated in an MRI examination of his left lower extremity, the results of which were "suggestive of reflex sympathetic dystrophy[2] involving the talus[3] and proximal portion of the calcaneus." (Tr. 176).

On April 13, 2002, Plaintiff was examined by Dr. Hulst. (Tr. 167-68). Plaintiff reported that the pain in his left foot/ankle was worsening. (Tr. 167). An examination of his left foot revealed no evidence of neurovascular abnormality, but the doctor observed "decreased arch height." Plaintiff exhibited "limited" eversion and inversion, as well as pain to palpation. X-rays revealed "decreased calcaneal inclination with slightly increased talar declination," as well as "asymmetric narrowing of the talonavicular joint."[4] Dr. Hulst diagnosed Plaintiff with (1) degenerative joint disease of the talonavicular joint, (2) peroneal tendonitis, (3) pes plano valgus, (4) contracted Achilles

---

[1] Pes plano valgus refers to "flatfoot," a foot with a fallen arch, so that most or all of the sole touches the ground. J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* P-143 (Matthew Bender) (1996).

[2] Reflex Sympathetic Dystrophy is a chronic condition characterized by burning pain and abnormalities in the sensory, motor, and autonomic nervous systems. The skin in affected areas is painfully sensitive to touch. Changes in sweating patterns, hair growth, subcutaneous tissues, muscles, joints or bones and difficulty moving joints or limbs are other hallmarks of this disorder. *See* NINDS Reflex Sympathetic Dystrophy Syndrome Information Page, *available at*, http://www.ninds.nih.gov/news_and_events/proceedings/reflex_sympathetic_dystrophy_2001.htm (last visited on August 22, 2005).

[3] The talus is the highest of the bones of the foot which joins the lower ends of the two bones of the leg to form the ankle joint. It is located directly above the calcaneus, the bone of the heel. J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* T-14 (Matthew Bender) (1996).

[4] The talonavicular joint is the joint formed by the talus and the navicular, a small bone directly in front of the talus. J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* T-130 (Matthew Bender) (1996).

tendon, and (5) bone marrow edema in the posterior aspect of the talus. *Id.* The doctor recommended to Plaintiff that he undergo surgery to correct these impairments. (Tr. 167-68).

On May 15, 2000, Plaintiff underwent surgery on his left foot, performed by Dr. Hulst. (Tr. 164-66). Specifically, the doctor performed the following procedures: (1) calcaneal osteotomy with allograft, (2) talonavicular fusion, and (3) tendoachilles lengthening. (Tr. 164). Plaintiff was discharged home later that day in good condition. (Tr. 166).

On May 30, 2000, Plaintiff was examined by Dr. Hulst. (Tr. 163). Plaintiff reported that he was "doing quite well." X-rays of Plaintiff's left foot revealed "good correction of the deformity." Plaintiff was instructed to "continue nonweight bearing." *Id.*

When examined by Dr. Hulst on July 6, 2000, Plaintiff reported that he was "doing quite well" and that "his pain is very minimal." (Tr. 160). X-rays of Plaintiff's left foot revealed "adequate initial union at the talonavicular joint. Screw is intact. Pin is intact, and the bone graft site is intact also." Plaintiff was given a removable walking cast and instructed to begin partial weight bearing one week later. *Id.*

On August 1, 2000, Plaintiff was examined by Dr. Hulst. (Tr. 159). Plaintiff reported that he was doing "quite well." He reported that he was able to engage in partial weight bearing activities, but experienced pain and swelling "if he is on it too much." An examination of Plaintiff's left foot revealed "adequate longitudinal arch height. . .with good foot alignment." X-rays revealed "good consolidation at the talonavicular joint." Plaintiff was instructed to continue to "gradually convert to full weight bearing in his walking cast."

On August 29, 2000, Plaintiff reported that he was making "gradual improvement" and was "wearing shoes and walking somewhat." Plaintiff was instructed to wear arch supports and avoid all barefoot walking. *Id.*

On September 26, 2000, Plaintiff was examined by Dr. Hulst. (Tr. 158). Plaintiff reported that he was "doing better and is improving," but "still has achy pain after significant activities." An examination of Plaintiff's left foot revealed "excellent arch height with good foot alignment." X-rays revealed "good full consolidation of the fusion site with adequate arch height." Plaintiff was instructed to begin participating in physical therapy.

On October 12, 2000, Plaintiff was examined by Dr. Hulst. Plaintiff reported that he was "doing well with therapy" and that "his activities are improving." He stated that his pain "is well improved from his pain before the surgery." An examination of Plaintiff's left foot revealed "excellent foot position" with "increased ankle dorsiflexion since the initiation of p[hysical] t[herapy]." Plaintiff was cleared to return to work. *Id.*

On June 4, 2002, Plaintiff was examined by Dr. Hulst. (Tr. 156). Plaintiff reported that he was experiencing pain in his right foot. The results of a manual examination of Plaintiff's right foot were largely unremarkable, however, x-rays revealed degenerative joint changes in the rear of the foot, as well as "early" degenerative joint disease in the talonavicular joint. With respect to his left foot, Plaintiff reported that his symptoms have improved "over 80%." *Id.*

On June 4, 2002, Plaintiff participated in a consultive examination performed by Dr. William Decker, who completed a report regarding Plaintiff's impairments. (Tr. 132-34). The doctor reported that Plaintiff suffered from osteoarthritis which was "stable" and "remediable by treatment." (Tr. 132-33). Dr. Decker reported that Plaintiff can frequently lift up to 20 pounds and

6

can occasionally lift up to 100 pounds. (Tr. 133). The doctor reported that during an 8-hour workday Plaintiff can stand for one hour, walk for one hour, and sit for six hours. The doctor reported that Plaintiff experienced no limitations in his ability to use his upper extremities to perform work-related activities. *Id.*

On June 24, 2002, Plaintiff completed a questionnaire regarding his activities. (Tr. 110-15). Plaintiff reported that he can stand for two hours and lift 20 pounds. (Tr. 112). He reported that he experiences no limitations sitting or using his upper extremities. Plaintiff reported that his doctor had not instructed him to limit his activities. *Id.* Plaintiff reported that he cooks, washes dishes, vacuums, shops, and washes laundry. (Tr. 113-14). He also reported that he drives, reads, and watches television. (Tr. 114).

On June 25, 2002, Plaintiff returned to Dr. Hulst. (Tr. 155). Plaintiff reported that his left foot was "doing quite well," but that his right foot was "bothering him much worse now." An examination of Plaintiff's left foot revealed "good position" and "adequate motion." An examination of Plaintiff's right foot revealed "decreased arch height" and "some suspected joint space narrowing." The doctor diagnosed Plaintiff with "low grade" pes plano valgus with "suspected" degenerative joint disease. *Id.*

On October 28, 2002, Plaintiff underwent surgery, performed by Dr. Hulst. (Tr. 151). Specifically, the doctor performed a talonavicular joint fusion of Plaintiff's right foot. Plaintiff was discharged home later that day in good condition with instructions to refrain from weight bearing activities. *Id.*

A November 12, 2002, examination of Plaintiff's right foot revealed "good" position. (Tr. 150). X-rays revealed "good reduction of deformity and good placement of fixation." *Id.*

7

On December 17, 2002, Plaintiff was examined by Dr. Hulst. (Tr. 148). Plaintiff reported that "he has been cheating a bit and putting some pressure on his foot in the last few days." The doctor observed that Plaintiff "seems to be tolerating this fairly well." An examination of Plaintiff's right foot was unremarkable and x-rays revealed "good initial union across the talonavicular fusion site." Plaintiff was given a walking boot and instructed "to convert to more full weight bearing" activities.

On January 21, 2003, Plaintiff was examined by Dr. Hulst. Plaintiff reported that his "swelling is coming down and he is starting to walk somewhat lightly in his athletic shoes, but otherwise uses his walking boot for longer distances." An examination of Plaintiff's right foot revealed "excellent arch height." X-rays revealed "good healing" across the fusion site and "good alignment overall." The doctor reported that Plaintiff "would have to remain on sit down job" for the time being. *Id.*

On March 11, 2003, Plaintiff was examined by Dr. Hulst. (Tr. 147). Plaintiff reported experiencing tenderness in his right foot. He also reported that he was unable to walk "long distances or stand on his feet." An examination of Plaintiff's right foot revealed "good" arch height and x-rays revealed "good alignment with fairly good bone union across the fusion site." Plaintiff was instructed to "more faithfully" wear his arch supports. *Id.*

On July 15, 2003, Plaintiff was examined by Dr. Hulst. (Tr. 147). Plaintiff reported that he was experiencing "significant lingering pain" in his right foot. An examination of Plaintiff's left foot revealed "fairly good" range of motion. An examination of Plaintiff's right foot revealed "limitation" of movement. The doctor also observed that when Plaintiff stands his right foot "shows

a fairly rectus position." Dr. Hulst "recommended" that Plaintiff "avoid stand up work indefinitely due to the problems he is having." *Id.*

On September 16, 2003, Plaintiff was examined by Dr. Hulst. (Tr. 200). Plaintiff reported that he was continuing to experience "lingering pain" on the top of his right foot. He reported that he "cannot walk more than a few blocks without pain sidelining him." An examination of Plaintiff's right foot revealed "good arch height" with a "fairly neutral position to the foot overall." The doctor observed "mild eversion of the calcaneus possibly." X-rays revealed

> mild hypertrophic spurs at the navicular cuneiform joint. There is good healing of the talonavicular fusion site overall. There is adequate arch height and alignment appreciated overall. Screw is somewhat prominent possibly at the navicular cuneiform joint.

Dr. Hulst diagnosed Plaintiff with "possible hardware irritation low grade osteophytic spurs at the navicular cuneiform joint [of the] right foot." The doctor recommended to Plaintiff that he undergo further surgery on his right foot. The doctor also reiterated that "it may be best for [Plaintiff] to work long term off his feet at [a] sit down job." *Id.*

On September 29, 2003, Plaintiff underwent further surgery on his right foot, performed by Dr. Hulst. (Tr. 201). Specifically, the doctor removed the screw from the previous surgery site and performed an osteotomy.[5] *Id.*

When examined by Dr. Hulst on October 7, 2003, Plaintiff reported that he was "doing fairly well." (Tr. 199). X-rays of Plaintiff's right foot revealed "good healing." *Id.* When examined the following week, Plaintiff reported that he was doing "okay at this point without excessive pain." (Tr. 198).

---

[5] An osteotomy is the surgical cutting of a bone or bony tissue. J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* O-124 (Matthew Bender) (1996).

On November 11, 2003, Dr. Hulst was deposed by Plaintiff's counsel regarding Plaintiff's impairments. (Tr. 202-23). When asked to describe Plaintiff's post-operative progress, the doctor testified that:

> Bone healing has been adequate and full. The bone has healed well. The success of the fusion was attained. [Plaintiff] has significantly less pain in the surgical area, but he does have pain in a neighboring joint that has some questionable degeneration, causing problems with standing and walking. His symptoms, therefore, his function has not returned, and he is not able to be on his foot long-term without a lot of aching and stiffness and pain in a slightly new location.

(Tr. 208-09).

Dr. Hulst testified that Plaintiff "seems to have very limited tolerance for standing and walking" and, therefore, should be limited to sit-down work. (Tr. 210-11). The doctor elaborated on this notion as evidenced by the following exchange:

> Counsel: When the judge hears your testimony and hears that it is recommended that the man have a sit-down job, he is going to assume that that means eight hours a day, as opposed to a patient who gets up and does one or two hours of walking and standing.
>
> Dr. Hulst: Correct.
>
> Counsel: Is that your recommendation?
>
> Dr. Hulst: At this point, due to his symptoms and the intolerance for being on his feet over an hour or two, I think it is the best plan.

(Tr. 216).

At the administrative hearing, Plaintiff testified that he experienced difficulty standing or walking for any length of time. (Tr. 237-45). Plaintiff testified that he could probably perform a job that permitted him to sit for the entire eight hour workday, but that he would be unable to perform a job that required him to be on his feet for even two hours out of an 8-hour workday. *Id.*

## ANALYSIS OF THE ALJ'S DECISION

### A. Applicable Standards

The social security regulations provide a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[6] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1420(a), 416.920(a). The regulations also provide that if an individual suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining a claimant's residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

---

[6]1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

**B. The ALJ's Decision**

The ALJ determined that Plaintiff suffers from the following severe impairments: pes planovalgus with talonavicular joint pain and degenerative joint disease of the right foot. (Tr. 14). The ALJ further determined that these impairments, whether considered alone or in combination, fail to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. *Id.* The ALJ concluded that while Plaintiff was unable to perform his past relevant work, there existed a significant number of jobs which he could perform despite his limitations. (Tr. 14-18). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

**1. The ALJ's Decision is Not Supported by Substantial Evidence**

The burden of establishing the right to benefits lies with Plaintiff, and he can satisfy his burden by demonstrating that his impairments are so severe that he is unable to perform his previous work, and cannot, considering his age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted above, the Commissioner has established a five-step disability determination procedure. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functional capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform work activities subject to the following limitations: (1) he can lift 10 pounds, (2) he can stand/walk for two hours during an 8-hour workday, (3) he can occasionally bend, twist, kneel, stoop, crouch, and crawl, and (4) he cannot climb stairs/ladders, walk on uneven surfaces, or operate foot controls. (Tr. 16).

Based on this RFC determination, the ALJ concluded that Plaintiff could not perform his past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff can perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964.

While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform specific jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, her limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Paul Delmar.

The vocational expert testified that there existed approximately 24,000 jobs which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 250). As such represents a significant number of jobs, *see, e.g.*, *Born v. Sec'y of Health and Human Services*,

923 F.2d 1168, 1174 (6th Cir. 1990), the ALJ concluded that Plaintiff was not disabled as defined by the Act.

> a. The ALJ's determination regarding Plaintiff's RFC is not supported by substantial evidence

A claimant's RFC represents his ability to perform "work-related physical and mental activities in a work setting on a regular and continuing basis," defined as "8 hours a day, for 5 days a week, or an equivalent work schedule." Social Security Ruling 96-8P, 1996 WL 374184 at *1 (Social Security Administration, July 2, 1996); *see also*, *Shaw v. Apfel*, 220 F.3d 937, 939 (8th Cir. 2000) (same); *Lanclos v. Apfel*, 2000 WL at *3, n.3 (9th Cir., July 31, 2000) (same); *Moore v. Sullivan*, 895 F.2d 1065, 1069 (5th Cir. 1990) (to properly conclude that a claimant is capable of performing work requires "a determination that the claimant can *hold* whatever job he finds for a significant period of time").

As detailed above, Plaintiff suffers from severe impairments to both his lower extremities. Dr. Hulst, Plaintiff's long-time treating physician, testified that Plaintiff was limited to the performance of sit-down work. This conclusion is amply supported by the objective medical evidence. The record also reveals that Plaintiff has not exaggerated the extent to which his impairments limit his ability to function. Plaintiff consistently reported to his care providers when his condition had improved and described his pain and limitation without exaggeration or histrionics. There is no suggestion in the record that Plaintiff has exaggerated his condition or failed to comply with treatment directives. Moreover, Plaintiff testified at the administrative hearing that he thought he could return to work so long as the job permitted him to sit for the entire workday. In sum, the

ALJ's conclusion that Plaintiff can stand/walk for two hours (*without benefit of a sit-stand option*) during an 8-hour workday lacks sufficient evidentiary support. At a *minimum*, Plaintiff requires a sit-stand option and may very well be limited to sit-down work only.

As indicated above, the vocational expert testified that there existed a significant number of jobs which Plaintiff can perform consistent with his RFC. However, the ALJ's RFC determination is not sufficiently supported by the evidence of record. In short, therefore, the hypothetical question, the response to which the ALJ relied upon to support his decision, was based upon an improper RFC determination. Accordingly, the ALJ's conclusion that there exists a significant number of jobs which Plaintiff can perform despite his limitations, is supported by less than substantial evidence. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir. 1996) (while the ALJ may rely upon responses to hypothetical questions posed to a vocational expert, such hypothetical questions must accurately portray the claimant's physical and mental impairments).

        b.      Evidence of Plaintiff's disability is not compelling

While the ALJ's decision is not supported by substantial evidence, Plaintiff can be awarded benefits only if proof of his disability is "compelling." *Faucher v. Sec'y of Health and Human Services*, 17 F.3d 171, 176 (6th Cir. 1994) (the court can reverse the Commissioner's decision and immediately award benefits if all essential factual issues have been resolved and proof of disability is compelling).

While the ALJ's decision fails to comply with the relevant legal standard, neither is the evidence of Plaintiff's disability compelling. As discussed above, Plaintiff can perform (at a minimum) work which permits him to sit throughout the work day. It must still be determined,

however, whether Plaintiff can also perform work activities subject to a sit-stand option. Furthermore, once an accurate RFC is developed for Plaintiff it must then be determined whether there exist a significant number of jobs which Plaintiff can perform consistent with his RFC. These are factual issues which this Court is not permitted to resolve. Instead, this matter must be remanded for the consideration of these (and any other relevant) issues.

## CONCLUSION

For the reasons articulated herein, the Court concludes that the ALJ's decision does not conform to the proper legal standards and is not supported by substantial evidence. Accordingly, the Commissioner's decision is **reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**. A judgment consistent with this opinion will enter.

Date:  August 30, 2005                                  /s/ Ellen S. Carmody
                                                        ELLEN S. CARMODY
                                                        United States Magistrate Judge